# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

KASHIE FERNANDEZ                                          CIVIL ACTION

VERSUS                                                   NO. 11-1322

JIM ROGERS, WARDEN                                       SECTION "A" (6)


## REPORT AND RECOMMENDATION

      This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. For the following reasons, it is hereby recommended that the instant petition be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL HISTORY[1]

      Petitioner, Kashie Fernandez, presently incarcerated in the Louisiana

---

[1]A portion of the procedural history was taken from the Louisiana Fourth Circuit's opinion, *State v. Fernandez*, 50 So.2d 219 (La. App. 4 Cir. 2010).

Correctional Institute for Women, was charged on September 26, 2008, with armed robbery and aggravated kidnapping. Fernandez appeared for her arraignment, pleaded not guilty, and the trial court modified the terms of her bond obligation, ordering that she be placed on a twenty-four curfew.

Subsequently, the State amended count two of the bill of information to second degree kidnapping, and Fernandez pled not guilty to the amended charge. Evidence was taken on defense motions over three days; the court denied the motion to suppress the identification and found probable cause.

On May 13, 2009, the trial court revoked the terms of Fernandez's original bond and increased her bond due to petitioner's violation of her curfew.

On the day of trial in Orleans Parish Criminal District Court, the defense moved for a continuance arguing that several articles in the Times–Picayune that month had unfairly prejudiced Fernandez. The trial court denied the motion, and the case proceeded to trial. The jury found Fernandez guilty of the responsive verdict of simple robbery and guilty as charged of second degree kidnapping. At the sentencing hearing, Fernandez's mother, Kim Jefferson, her pastor, Henry Jounson, Jr., and her uncle, Jewel Rushing, testified for her.

For simple robbery the trial court sentenced Fernandez to seven years at hard labor in the custody of the department of corrections, and for the second degree kidnapping,

the trial court sentenced Fernandez to 40 years at hard labor, the first two years of the sentence were ordered to be served without benefit of probation, parole, or suspension of sentence. The sentences were ordered to be served concurrently.

The state filed a multiple bill of information alleging that Fernandez was a second felony offender, having previously been convicted of theft in 2002. Fernandez pled guilty to the multiple bill on July 9, 2009. The court vacated its previous sentence for second degree kidnapping and re-sentenced Fernandez to 40 years at hard labor without benefit of probation, parole, or suspension of sentence. Fernandez filed a motion to reconsider the multiple bill sentence, which the court denied.

On October 6, 2010, the Louisiana Fourth Circuit Court of Appeal affirmed Fernandez's convictions and sentences. *State v. Fernandez*, 50 So.3d 219 (La. App. 4 Cir. 2010). On April 8, 2011, the Louisiana Supreme Court denied Fernandez's writ application. *State v. Fernandez*, 61 So.3d 682 (2011).

Fernandez did not seek post-conviction relief in the state court system, but rather, on June 2, 2011, filed the instant habeas corpus petition. In her habeas application, Fernandez sets forth the following claims: 1) She was denied due process when the trial court denied her motion to continue the trial based on prejudicial pre-trial publicity; 2) her right to present a defense was impinged when the trial court refused to allow investigator

Don Carter provide hearsay testimony; 3) there was insufficient evidence to support her convictions; and, 4) she received an excessive sentence.

The State concedes and this court's review of the record confirms that the instant action is timely and that Fernandez has exhausted her state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Accordingly, the court shall proceed to address the merits of Fernandez's claims following its review of the pertinent facts and applicable standard of review.

## II. FACTS[2]

Natalie Ross testified that in May of 2008 she was living in Slidell, Louisiana, with her fiancé, Wendell Cousin, and their infant daughter. Ross ran a successful hair salon from her house. Ross recounted how she grew up in the Gentilly Woods section of New Orleans, along with Cousin, whom she had known practically her entire life. Kashie Fernandez also grew up in the same neighborhood, and Ross had known her since she was thirteen years old.

Fernandez telephoned Ross in early May. The two talked at length catching up, and then Fernandez told Ross that she wanted to come to her house for a visit. Ross gave

---

[2]The facts are taken from the Louisiana Fourth Circuit Court of Appeal's opinion, *Fernandez,* 50 So.3d at 222-224.

her directions. Ross thought it strange that Fernandez would want to come to her house after they had talked for so long, especially since Fernandez lived in Baton Rouge. Fernandez and her boyfriend stopped by the house later in the day for a brief visit of only about ten minutes. Apparently, the two almost left before coming in, as Ross saw the car leaving the driveway as she came outside.

About a week later, early in the day on May 12, Ross received another telephone call from Fernandez, who related that she was in New Orleans and needed a ride. Ross was busy and unable to leave right away. She did nothing about the call. Over the course of the day, Ross received four more telephone calls from Fernandez. At 1:50 p.m., Fernandez called to see where Ross was and what was taking her so long; she called again shortly after 3:00 p.m. and again about an hour later and finally at 4:15 p.m. After telling Fernandez that she was coming to get her, Ross telephoned Cousin, who was in New Orleans East, and asked him to get Fernandez. Ross gave him Fernandez's phone number, and he called Fernandez to get her exact location.

At trial, Ross identified phone records detailing the times that the calls were received.

Wendell Cousin testified that Ross called him and asked him to pick up Kashie Fernandez because Ross was unable to do so. Cousin agreed to pick up Fernandez. He

called her on the phone, and she told him that she was in the Little Woods area off of Curran Boulevard by Sand Street. She was not able to provide a specific address and described the intersection where she was located.

When Cousin arrived at the location, he observed Fernandez and her boyfriend, whom he had met the week before in Slidell when they came to visit. Cousin pulled the car over and briefly looked down while he cleared the passenger seat of some personal belongings. When he looked up, he saw two men with guns standing at his window. Kashie's boyfriend opened the passenger door and got in the car. He was armed and asked Cousin where the money was. He took six hundred dollars from Cousin, which Cousin said he had earned by painting at a neighbor's house earlier in the week.

Then the two men in the street opened the driver's side door and told Cousin to get out. They searched him and removed his wallet and all of his belongings. Fernandez was standing with her boyfriend on the other side of the car. She looked calm.

Cousin was then instructed to enter the backyard of the adjacent house. When they got to the backyard, he was made to lie on the ground face down, and the men bound his hands and feet and tied them together. There were four men altogether. While Cousin was on the ground, one of the men told Cousin that "she said, 'You all have it.' And we know that your fiancé and your baby are at the house. And if we don't get nothing, we're going to

kill both of them." Cousin believed the man was referring to Kashie.

When Cousin heard this, he cussed the men out, and one of them hit him in the head. After that, three of the men carried him to the car, which was backed up in the driveway. Upon reaching the car, they dropped him on the ground, and he heard one of them say, "Hold on, a neighbor." A few seconds later he said, "Okay", and then they threw him in the trunk. The car drove off, with the radio playing loudly and people were talking, but he could not hear what anyone was saying.

After a few minutes, the car stopped and everyone got out. Cousin heard the door open, and someone said, "Take care of your business and wipe the car down when you're finished." Cousin believed that he was going to be killed.

Cousin was able to loosen the knots behind his back and get his arms and legs free. The car began to move again, and when it stopped, Cousin pulled the inside trunk release, got out, and ran. Cousin saw a woman and her son standing on a nearby corner. He asked to use her phone and called Ross to tell her to get out of the house. Then Cousin called a friend, who arrived about forty-five minutes later and took him home. He found Ross across the street, safe. Cousin explained that he did not call the police right away because he was in a rage and wanted only to do something to hurt Fernandez.

Ross testified that after Cousin called her, she grabbed her baby and ran to a

neighbor's house; Cousin arrived about an hour later. Ross testified that he was acting crazy and talking about getting back at Fernandez. She was able to calm him down, and after first calling the Slidell Police Department, they traveled to New Orleans to report the crime.

Detective Darrell Doucette testified that he encountered Wendell Cousin and Natalie Ross when they arrived at the Seventh District Police Station to report a robbery and kidnapping. Cousin appeared very upset. Doucette observed that Cousin had a rope tied to one wrist. He could see indentions and abrasions from where his wrists were bound together. The rope was collected as evidence and admitted at trial. Photographs taken of Cousin at the station were presented to the jury. Later, Detective Doucette returned to the area and interviewed the few residents on the street. No one recognized a photograph of the petitioner.

Cousin and Ross were able to identify petitioner only by her first name and part of her last name. Detective Doucette was able to identify Fernandez by visiting her neighborhood as directed by Cousin. With this information he compiled a photographic lineup. Cousin identified her from the lineup, and Detective Doucette obtained a warrant for her arrest. Cousin later identified Fernandez in court. (St. rec., vol. 3, trial transcript, p. 127).

Detective Doucette traveled with Wendell Cousin to Little Woods where the

robbery took place, which Doucette explained remained mostly unoccupied after Hurricane Katrina. Detective Doucette identified photographs of the driveway and surrounding area that were taken by the crime lab.

The defense called Don Carter, an investigator, as a witness, and the State moved for a sidebar . In chambers, the court asked defense counsel to state the basis for calling the witness. Counsel explained that he engaged Don Carter to investigate Wendell Cousin's statement that he earned the six hundred dollars taken in the robbery by painting for a man who lived across the street from his grandparents' house. Counsel explained that Mr. Carter determined that there was only one house across the street from Cousin which was not abandoned, and that he interviewed the owner who denied knowing Wendell Cousin. Counsel explained that he had issued a subpoena for the neighbor at the previous trial setting but did not see him at that time. Counsel stated that he had placed a telephone call to the subject the previous evening but did not get a response.

The State objected to Investigator Carter testifying on the basis that his testimony would be hearsay. The trial court agreed and ruled that Investigator Carter's testimony would be inadmissible hearsay. Defense counsel noted his objection and moved for a mistrial on the basis that Ms. Fernandez was being denied the right to present a defense. The trial court denied the motion, and the defense rested.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state

court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

### A. Prejudicial Pre-Trial Publicity

Fernandez argues that her constitutional rights were violated by virtue of the fact that her motion to continue the trial, based upon prejudicial pre-trial publicity, was denied. Specifically, Fernandez complains about two articles which appeared in the Times-Picayune on May 12th and May 13th 2009, suggesting that Fernandez may be linked to the

murder of an elderly couple who were related to the kidnapping victim, Wendell Cousin.[3]

Based upon the above-described articles, defense counsel, on May 21, 2009, the day of trial, sought to continue the trial. (St. rec., vol. 3, trial transcript, pp. 2-3). The trial court denied Fernandez's motion, providing:

> Okay, for the record, I just want to point out, out of [an] abundance of caution, so the record is clear; that there is nothing in the newspaper today, nor was it in the media today, nor has it been this week.
>
> In addition to that, I don't find that, that would be relevant. We will take it up during voir dire [i.e., we will question prospective jurors to see if they are aware of the articles and, if so, have been prejudiced against petitioner as a result of the articles].... I'm denying your motion for a continuance.

(St. rec., vol. 3, trial transcript, p. 4).

In support of her claim that the trial court erred in denying her motion to continue, Fernandez relies solely on state law.[4] However, it is well-established that a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation

---

[3]A copy of the newspaper articles are contained in the State rec., vol. 2.

[4]Interestingly, the specific state law which Fernandez cites, LSA-C.Cr.P. article 712, does not provide, as Fernandez contends, that where "there is a reasonable likelihood that prejudicial news media publicity prior to trial will prevent a fair trial, the trial judge should continue the case until the threats abates [sic]." (Fed. rec., doc. 1, supporting memorandum, p. 6). Instead, Article 712 merely provides: "A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor."

omitted). In *Swarthout v. Cooke*, __ U.S. __, 131 S. Ct. 859, 861, 178 L.Ed.2d 732 (2011), the Supreme Court found that the Ninth Circuit erred in "granting habeas relief based upon its conclusion that the state courts had misapplied [state law]...." The Court provided:

> The habeas statute "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.' " *Wilson v. Corcoran,* ... 131 S.Ct. 13, 15, 178 L.Ed.2d 276 (2010) (*per curiam*) (quoting 28 U.S.C. § 2254(a)). "We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' " *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)).

*Id.*

Further, in connection with a denial of a continuance based upon pre-trial publicity, federal law dictates that prejudice resulting from the pre-trial publicity must be so extreme that the petitioner was clearly denied a fair trial. Specifically, Fernandez has the burden of showing that her conviction was "obtained in a trial atmosphere that [was] utterly corrupted by press coverage...." *Skilling v. United States*, __ U.S. __, 130 S.Ct. 2896, 2914, 177 L.Ed.2d 619 (2010) (bracket in original) (quotation omitted). To that end, the Supreme Court's decisions "cannot be made to stand for the proposition that juror exposure to...news accounts of the crime...alone presumptively deprives the defendant of due process." *Id.* (quotation omitted). Instead, "[a] presumption of prejudice...attends only in extreme cases."

*Id.* at 2915. *See, e.g. Rideau v. Louisiana*, 373 U.S. 723, 725-727, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (intense pretrial media coverage included televised, detailed confession by defendant that amounted to a "kangaroo court proceeding[]"); *Estes v. Texas*, 381 U.S. 532, 536, 85 S.Ct. 1628 (1965) (overzealous televison reporting "bombard[ed]...the community with the sights and sounds of" the proceedings, "led to considerable disruption," and undermined the "judicial serenity and calm to which the petitioner was entitled."); *Sheppard v. Maxwell*, 384 U.S. 333, 353, 355, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ("bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," jurors became "celebrities," and a "carnival atmosphere" pervaded trial).

Fernandez has failed to show that her case was "extreme" and, therefore, that the denial of her motion for a continuance constituted a violation of her right to due process. The State's denial of relief does not constitute an unreasonable application of Supreme Court law to the facts of this case.

**B.  Testimony of Investigator Don Carter**

Fernandez argues that her right to present a defense was violated when the trial court refused to allow defense investigator Don Carter testify regarding hearsay statements made by a non-testifying declarant.  Fernandez sought to get the hearsay statements into evidence to impeach victim Wendell Cousin's trial testimony regarding how he obtained the

14

$600 dollars stolen from him. Fernandez asserts that Carter's testimony was "critical because the case turned on Cousin's testimony and Mr. Carter's testimony was the only means of challenging Mr. Cousin's credibility." (Fed. rec., doc. 1, supporting memorandum, pp. 7-8).

The seminal case regarding the admission of hearsay evidence to protect a petitioner's constitutional right to present a defense, was enunciated by the Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In *Chambers*, 410 U.S. at 298, 93 S.Ct. at 1047, petitioner, Leon Chambers, was convicted of shooting and killing a police officer. In an attempt to exonerate himself, Chambers sought to offer into evidence the hearsay testimony of three individuals to whom Gable McDonald had confessed to shooting the officer. The trial court refused to allow the hearsay evidence and the appellate courts affirmed the trial court's evidentiary decision.

In its analysis, the Court briefly explained the hearsay rule and why hearsay evidence is generally excluded at trials.

> The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available

in order that his demeanor and credibility may be assessed by the jury....

*Id*., 410 U.S. at 298, 93 S.Ct. at 1047 (citation omitted).

Based, in part, upon the fact that the hearsay testimony at issue was critical to Chambers' defense, the Court determined that Chambers, by virtue of the exclusion of this critical hearsay evidence, had been denied a fair trial. The Court, however, limited its ruling to the particular facts at issue, advising:

> In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

*Id*., 410 U.S. at 302, 93 S.Ct. at 1049.

The Louisiana Fourth Circuit Court of Appeal, in addressing the instant issue on direct appeal, relied not only upon *Chambers*, but also upon corresponding state law.

> [U]nder compelling circumstances a defendant's right to present a defense may require admission of statements which do not fall under any statutorily recognized exception to the hearsay rule. *State v. Van Winkle,* 94–0947 (La.6/30/95), 658 So.2d 198; *State v. Gremillion,* 542 So.2d 1074 (La.1989); *see also Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). This right to present a defense, however, does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate

considerations in the administration of justice. *State v. Mosby,* 595 So.2d 1135 (La.1992); La. C.E. art. 403....

In *Gremillion,* the defendant was prevented from introducing a statement by the victim to an investigating officer regarding the circumstances that led to his violent death and failed to implicate the defendant, who was a close friend of the victim. The Louisiana Supreme Court reversed the conviction. The Court agreed that the statement was hearsay and that it did not meet any applicable exception. However, citing *Chambers v. Mississippi,* the Court concluded that normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if the exclusion of such evidence would compromise the defendant's right to present a defense. In *Van Winkle,* the defendant was accused of murder and was prevented from introducing testimonial evidence in support of the defense that an upstairs neighbor to the victim committed the crime, despite the existence of physical evidence supporting the defense. The conviction was also reversed.

In contrast to the foregoing cases, in *State v. Stukes,* 2005–0892 (La.App. 4 Cir. 10/25/06), 944 So.2d 679, this Court rejected the defendant's claim that his right to present a defense was violated when he was not allowed to introduce hearsay evidence that was cumulative to his own testimony and the testimony of the investigating officer who took the defendant's statement.

In *Van Winkle* and *Gremillion,* the excluded evidence was highly relevant in proving that someone else was responsible for the offense and created the compelling circumstances required in order to justify reversing the convictions. *Stukes,* on the other hand, demonstrates that despite a defendant's claim that excluded evidence violated his right to present a defense, the defendant must demonstrate a tangible basis for concluding that his substantial rights were affected.

*Fernandez*, 50 So.3d at 228-229.

Thereafter, the Louisiana Fourth Circuit applied the above law to the applicable facts.

Defendant contends that the excluded testimony was critical because the case turned on Cousin's testimony and Don Carter's testimony was defendant's only means of challenging Cousin's credibility. Accordingly, defendant argues that her conviction should be reversed.

We do not find the hearsay testimony was so critical that the trial court should have allowed it. Cousin testified at length during the trial, and defendant conducted a full and unfettered cross examination of him. The ability to challenge Cousin's credibility was certainly an element of the defense; but how Mr. Cousin earned the money that was stolen in the robbery was not central to [the] question of defendant's guilt. The evidence sought to be introduced falls well short of the type of evidence that was excluded in *Van Winkle* or *Gremillion* and provided reason for reversing the defendants' convictions.

*Id*. at 229.

This court finds that the above reasoning on the part of the Louisiana Fourth Circuit Court of Appeal does not represent an unreasonable application of Supreme Court law to the facts of this case. Clearly, the hearsay evidence which Fernandez sought to introduce at trial is not comparable to the type of evidence, described in *Chambers*, which warrants the admission of hearsay testimony.

## C. Insufficient Evidence to Support Convictions

Fernandez argues that the evidence presented by the State was insufficient to support her convictions. Specifically, Fernandez asserts that "[s]he was not on the scene when Cousin was tied up and put in the trunk, and she was nowhere in sight after the other

men approached Mr. Cousin with guns drawn." (Fed. rec., doc. 1, supporting memorandum, p. 10).

In addressing petitioner's insufficiency claim on direct appeal, the Fourth Circuit Court of Appeal first examined applicable law.

> In reviewing the sufficiency of the evidence to support a conviction, we follow the due process standard of review enunciated in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under that standard, "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville,* 448 So.2d 676, 678 (La.1984). That standard "preserves the role of the jury as the factfinder in the case but it does not allow jurors 'to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.' " *State v. Pierre,* 93–0893 at p. 5 (La.2/3/94), 631 So.2d 427, 429. The jury is not allowed to engage in speculation based merely upon "guilt by association." 93–0893 at pp. 5–6, 631 So.2d at 429. In order for the trier of fact to convict and for the reviewing court to affirm a conviction, the totality of the evidence must exclude reasonable doubt.
>
> Under *Jackson*, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. *See State v. Jacobs,* 504 So.2d 817, 820 (La.1987). When circumstantial evidence forms the basis of the conviction, the totality of such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. However, "[h]ypotheses of innocence are merely methods for the trier of fact to determine the existence of a reasonable doubt arising from the evidence or lack of evidence." *State v. Shapiro,* 431 So.2d 372, 389 (La.1982) (on reh'g) (Lemmon, J., concurring). This circumstantial evidence rule is not a separate test from the *Jackson* standard; rather, La. R.S. 15:438 merely "provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found defendant guilty beyond a reasonable doubt." *State v.*

*Wright,* 445 So.2d 1198, 1201 (La.1984). "Although the circumstantial evidence rule may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence." *State v. Chism,* 436 So.2d 464, 470 (La.1983).

*Fernandez*, 50 So.3d at 225-226 (citation omitted).

Thereafter, the state appellate court reviewed Fernandez's argument.

Defendant contends the evidence was insufficient to establish that she was directly concerned in the commission of either Cousin's robbery or his second degree kidnapping. She argues that, at best, the State's evidence demonstrates that she got Cousin to go to Sand Street after which she left and that there was no evidence that she intended to participate in anything that happened after she left. She further asserts there is no evidence that she agreed to or assisted with the use of force, or the plan to take Wendell Cousin anywhere in the car.

*Id.* at 226.

Following its review of Fernandez's argument, the Louisiana Fourth Circuit examined the crime elements which the State was required to prove to support her convictions.

In order to convict a defendant of simple robbery, the State must prove that defendant: (1) took something of value (2) belonging to another (3) from the person of another (4) by use of force or intimidation. La. R.S. 14:65; *State v. Florant,* 602 So.2d 338 (La.App. 4 Cir.1992).

Second degree kidnapping, in pertinent part, is the forcible seizing and

carrying of any person from one place to another, wherein the victim is imprisoned or kidnapped when the offender is armed with a dangerous weapon. La. R.S. 14:44.1(A)(5) & B(1).

La. R.S. 14:24 defines "principals" as "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime[.]"

Generally, courts reviewing a defendant's conviction as a principal look to evidence of actions preceding the offense, during the offense, and after the offense. Often, the State is able to show a defendant helped plan the offense at issue, or knew of the plan before the offense, and elected to participate. *See, e.g., State v. Peters,* 553 So.2d 1026 (La.App. 4 Cir.1989) and *State v. Johnson,* 440 So.2d 197 (La.App. 3 Cir.1983).

Although La. R.S. 14:24 provides that all persons "concerned in the commission of a crime" are principals, there are important qualifications, as discussed by the Louisiana Supreme Court in *State v. Pierre,* 93–0893 (La.2/3/94) 631 So.2d 427:

> Only those persons who knowingly participate in the planning or execution of a crime are principals. *State v. Knowles,* 392 So.2d 651 (La.1980). Mere presence at the scene is therefore not enough to "concern" an individual in the crime. *State v. Schwander,* 345 So.2d 1173 (La.1977). Moreover, "an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." *State v. Holmes,* 388 So.2d 722, 726 (La.1980).

*Id.* p. 4, 631 So.2d at 428.

In *State v. Bridgewater,* the Court also noted:

> As a general rule, "liability [as a principal] will not flow merely from a failure to intervene;" however, "silence in the face of a friend's crime will sometimes suffice when the *immediate proximity* of the bystander is such that he could be expected to voice some opposition or surprise if he were not a party to the crime." 2 Wayne R. LaFave and Austin W. Scott, Jr.,

Substantive Criminal Law § 6.7(a) (1986) (Emphasis supplied).

*Id.,* 2000–1529, pp. 11–12, 823 So.2d at 891.

*Fernandez,* 50 So.3d at 226-227.

Thereafter, the Louisiana Fourth Circuit concluded:

Viewing the evidence in the light most favorable to the state, we find a reasonable juror could readily have concluded that the defendant was a principal to the robbery and kidnapping of Wendell Cousin. Fernandez's actions preceding and during the offense point directly to her knowing and voluntary participation in both crimes.

Although she was not armed and said nothing during the robbery, she was in the immediate proximity of the vehicle when the robbery took place and voiced no concern over her boyfriend's actions. A rational juror could have concluded that by repeatedly calling Ross, Fernandez meant to lure Ross or Cousin to an isolated and nearly abandoned area, thereby evidencing that she knew of the offense before hand, helped to plan it and was in fact a principal to the crime.

Also, a reasonable jury could have found that the evidence proved Fernandez's involvement dated back to her initial visit the week before the robbery and that the basis for Fernandez's earlier visit was to identify and locate Ross and Cousin's Slidell home.

Although Fernandez was out of sight after Cousin was taken into the backyard, viewing the evidence in the light most favorable to the prosecution, a reasonable juror could have found sufficient evidence to demonstrate that Fernandez was "concerned with the commission of" the second degree kidnapping.

First, any trier of fact should have been impressed by the fact that the perpetrators had the forethought to bring rope to bind the victim. It is clear that the perpetrators tied up Cousin to transport him easily without fear of his escaping. Accordingly, the evidence suggests that from the outset the plan included "the forcible seizing and carrying of" the victim "from one place to

another, wherein the victim is imprisoned or kidnapped."

That Fernandez did nothing to conceal her involvement in the commission of the crime and stood by at the scene with no effort to conceal her identity, and that she was involved with the armed men, suggests she did not fear being identified to the police. This suggests that she believed Cousin was not going to be released.

Although Fernandez was out of sight when Cousin was tied up and put in the trunk, a reasonable juror could also have concluded that it was Fernandez who backed the automobile into the driveway from the street, thereby facilitating the kidnapping.

The evidence offered at trial points convincingly to the defendant's knowing and voluntary participation in both the robbery and the kidnapping.

*Fernandez,* 50 So.3d at 227.

This court finds that the above does not represent an unreasonable application of the law enunciated in *Jackson*, *supra*, to the facts of this case.

## D. Excessive Sentence

Fernandez argues that the 40-year sentence she received was unconstitutionally excessive due to the following factors: 1) Her participation in the kidnapping and robbery was minimal in that she was not armed, she made no threats against the victim's family, she was not present when Cousin was driven off in the trunk of a car, and Cousin was not seriously injured; 2) since her predicate conviction, she has sought to better herself, earning a GED, going to nursing school, and raising two children; and, 3) the sentence was

influenced by the pre-trial publicity tying her to the gruesome murder of an elderly couple when, in fact, she had no connection to the murders. (Fed. rec., doc. 1, supporting memorandum, pp. 13-14).

With regard to petitioners' complaints that they have received excessive sentences, the Supreme Court has specifically rejected the principle that the Eighth Amendment contains a proportionality guarantee. *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).[5] If a sentence is within the statutory limits, a federal habeas court will not upset the terms of that sentence unless it is so disproportionate to the offense as to be completely arbitrary and shocking. *Bonner v. Henderson*, 517 F.2d 135, 136 (5th Cir. 1975); *see also Smallwood v. Johnson*, 73 F.3d 1343, 1347 (5th Cir. 1996) (emphasizing that a federal court will not review a state sentencing without a threshold showing that the sentence is "grossly disproportionate to the offense").

In addressing Fernandez's excessiveness argument on direct appeal, the Louisiana Fourth Circuit examined the pertinent statutory sentencing limit, providing: "Convicted of second degree kidnapping and sentenced as a second felony offender,

---

[5]In *Harmelin*, 501 U.S. at 962, 111 S.Ct. at 2684 (quoting *Rummel v. Estelle*, 445 U.S. 263, 274, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980)), the Supreme Court reaffirmed that "'for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative.'"

defendant was subject to a sentence of between ten and eighty years." *Fernandez*, 50 F.3d at 230.[6]

Following a review of petitioner's reasons why she should not have received a 40-year sentence, the same reasons set forth in the instant writ application, the Louisiana Fourth Circuit reviewed the trial court's basis for imposing the lengthy sentence.

Here, despite the fact that defendant did not actually brandish a weapon or participate in binding Cousin, the trial court found that defendant was the "lynchpin," noting that it was defendant who knew Cousin and Ross and that without her, the crime would never have taken place.

As further justification for defendant's lengthy sentences, the court was impressed with the fact that even after defendant had visited with Cousin and Ross at their home and witnessed the life they were trying to make for themselves, she did not hesitate to proceed with the crime and telephoned Ross repeatedly in effort to complete the crime.

The court found that defendant's callous disregard for the likely consequences of her actions upon Cousins or Ross overcame the positive testimony made on her behalf at the hearing.

The court's comments at sentencing also reflect that it was disturbed by the perpetrators' comments ("Take care of your business and wipe the car down when you're finished.") indicating they anticipated Cousin would be killed rather than released. Here, the court's focus on the potential ramifications of the defendant's actions was in keeping with other courts' emphasis on "the element of violence and danger to the person" in assessing the nature and gravity of an offense. *State v. Taves,* 2003–0518, p. 5

---

[6]The state appellate court also reviewed the statutory sentencing guideline associated with a simple robbery conviction. However, petitioner, in the instant habeas application, does not challenge the seven year sentence she received as a result of her conviction on the charge of simple robbery.

(La.12/3/03), 861 So.2d 144 (*per curiam*).

*Fernandez*, 50 So.3d at 232.

Fernandez's 40-year sentence is within statutory limits. Further, the sentence is not "so disproportionate to the offense as to be completely arbitrary and shocking." As such, Fernandez's excessive sentence claim is without merit. Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application of petitioner, Kashie Fernandez, for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[7]

New Orleans, Louisiana, this __12th__ day of _____December_____, 2011.


_____
LOUIS MOORE, JR.
United States Magistrate Judge

---

[7]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.